29 F.Supp.2d 576 (1998)
KNIGHTS OF THE KU KLUX KLAN, Realm of Missouri, and Michael Cuffley, Petitioners,
v.
Patricia BENNETT, in her official capacity as General Manager of KWMU Radio only, et al., Respondents.
National Public Radio, a/k/a National Public Radio, Inc., Amicus Curiae.
No. 4:97CV2109 TCM.
United States District Court, E.D. Missouri, Eastern Division.
December 10, 1998.
Robert Herman, Partner, Schwartz and Herman, St. Louis, MO, for Knights of the Ku Klux Klan, Realm of Missouri, Michael Cuffley, plaintiffs.
Katharine S. Bunn, University of Missouri, General Counsel's Office, Columbia, MO, for Curators of the University of Missouri. Marvin E. Wright, Knight and Ford, Nancie D. Hawke, University of Missouri, General Counsel's Office, Columbia, MO, for Patricia Bennett, Theodore C. Beckett, Paul T. Combs, Adam B. Fischer, Mary S. Gillespie, Fred L. Hall, Jr., Dr. Malaika B. Horne, *577 John A. Mathes, Paul W. Steele, Dr. Hugh E. Stephenson, Jr., defendants.
Elizabeth C. Carver, Associate, Bryan Cave L.L.P., St. Louis, MO, for National Public Radio, Inc. aka National Public Radio, Inc., amicus.

MEMORANDUM AND ORDER
MUMMERT, United States Magistrate Judge.
This matter is before the Court upon the parties' cross-motions for summary judgment. [Docs. 40, 44] The parties have stipulated to the submission of their dispute on the testimony at an evidentiary hearing held on August 12, 1998, on Petitioners' motion for a preliminary injunction; exhibits submitted at that hearing; and exhibits attached to the motions for summary judgment.

Background
The Knights of the Ku Klux Klan, Realm of Missouri, and Michael Cuffley, the state coordinator for the Missouri Knights of the Ku Klux Klan, initiated this action against respondents, the individual Curators of the University of Missouri, and Patricia Bennett, KWMU's general manager,[1] seeking injunctive and declaratory relief on their claim that Respondents violated their First and Fourteenth Amendment rights when refusing the Ku Klux Klan's request to underwrite a program broadcast by KWMU.
As the state coordinator for the Knights of the Ku Klux Klan, Realm of Missouri, Mr. Cuffley is the highest ranking official in that organization in Missouri. (Tr. 157.)[2] He has held that position for six years. (Id.) Mr. Cuffley's duties for the Ku Klux Klan include speaking at public events, planning activities, and coordinating activities with other Ku Klux Klan organizations around the country. (Id. at 158.)
Mr. Cuffley's organization traces its roots back to 1865 and the aftermath of the Civil War. (Id.) His organization has no official ties to any other Ku Klux Klan organizations, other than the use of the term Ku Klux Klan in its title and a belief in the general principles of the Ku Klux Klan. The Ku Klux Klan admits only American-born white Christians. Mr. Cuffley testified that his organization does not advocate violence, but does participate in "cross lightings"  Mr. Cuffley has participated in a hundred  at which members wear the traditional robes and hoods. (Tr. at 171.)
KWMU is a not-for-profit public broadcast radio station operated by the University of Missouri at St. Louis ("UMSL"). Its licensee, the Curators of the University of Missouri, is a member of National Public Radio, Incorporated ("NPR"). (Jackson Aff. at ¶ 4.) The Director and General Manager of the radio station is Patricia Bennett. (Tr. at 7.) She reports to Dr. Donald H. Driemeier, the Deputy to the Chancellor of UMSL, who in turn reports to Dr. Blanch M. Touhill, the Chancellor of UMSL and its Chief Executive Officer. (Id. at 9.)
The organizational chart for the station lists five divisions under Ms. Bennett's control: the program director, the business manager, the chief engineer, the development director, and the sales manager. (Id.) The development director is in charge of fund-raising, and the sales manager supervises the sales representatives that seek underwriting for the radio station. (Id. at 11, 12.) Only a certain percentage of air time is allotted for underwriting spots. (Id. at 20, 21.) What percentage is a decision made internally by the General Manager with input from her senior team. (Id.) Different amounts of time are set aside for underwriting for different shows, with some limitations being dictated by the type of program. (Id. at 21-22 .)
When an organization makes an underwriting gift to KWMU, that organization is permitted to submit a fifteen-second message to be read on the radio station. (Id. at 33.) The donor provides a gift; KWMU acknowledges that gift on the air. (Id. at 38.) Some underwriting messages are drafted by the *578 donors. (Id. at 38-39.) Other messages are drafted by, or with input and assistance from, KWMU's employees. (Id. at 39.) All underwriting scripts must be reviewed by the station's management. Enhanced underwriting permits the fifteen-second spot to provide identifying information about the organization and a logo or slogan of the donor's organization. (Id. at 29.) KWMU's policy is to permit enhanced underwriting. (Pet'rs Ex. 2.)[3] Classes of underwriters include for-profit organizations, companies, and corporations; not-for-profit organizations, corporations and companies; and social services organizations. (Pet'rs Exs. 3-24, 26-37.)
Although Ms. Bennett approves the text of approximately thirty underwriting scripts per week, she does not examine, as a matter of course, the policy or philosophy of each potential underwriter. (Tr. at 62, 122.) She has rejected a request for underwriting from a group titled "Ultimate Fighting Championships"; an establishment she heard was "a house of ill repute"; and the American Friends Service Committee, the latter on the grounds that the group's message was political. (Id. at 118, 121-22; Bennett Dep. at 87.) Ms. Bennett testified that Federal Communications Commission ("FCC") regulations do not allow public radio stations to broadcast political announcements from candidates, except those running for federal office, or messages promoting or criticizing ballot issues. (Id. at 82.)
Some time prior to September 24, 1997, Mr. Cuffley contacted KWMU by telephone and requested information on underwriting a number of fifteen second spots on the station's "All Things Considered" program. (Id. at 160-61.) "All Things Considered" is a radio program that is produced and distributed by NPR, and is a part of KWMU's regular programming. (Jackson Aff. at ¶ 5.) Mr. Cuffley testified that he enjoys the program and wishes to support the station. He hoped to attract a higher, more educated person to his organization. (Id. at 160.) He did not initially identify himself or his organization. (Id. at 161.) The sales representative quoted Mr. Cuffley the underwriting costs for not-for-profit organizations and requested his telephone number, advising Mr. Cuffley that a sales representative would contact him at a later date. (Id. at 161, 163.) There was no contract or agreement worked out between the representative and Mr. Cuffley. After approximately a week with no contact by KWMU, Mr. Cuffley made several telephone calls to the station but was unable to speak with a sales representative. (Id. at 163-64.) On September 24 and again five days later, Mr. Cuffley wrote letters to the station requesting the opportunity to sponsor four segments of "All Things Considered." (Resp'ts Ex. A.) The following message was submitted to the radio station by the Ku Klux Klan to be read in acknowledgment of the underwriting gift:
The Knights of the Ku Klux Klan, a white Christian organization, standing up for rights and values of white Christian America since 1865. For more information, please contact the Knights of the Ku Klux Klan at Post Office Box 525, Imperial, Missouri, 63052. Let your voice be heard.
(Tr. at 86-87.)
The message proposed by the Ku Klux Klan to be read on air did not violate any of KWMU's enhanced underwriting guidelines.[4] (Id. at 89.)
*579 On October 3, Ms. Bennett wrote Mr. Cuffley a letter declining the underwriting gift. (Pet'rs Ex. 38.)
Mr. Cuffley testified that he was accustomed to receiving rejections on behalf of the Ku Klux Klan and fully expected that KWMU would reject the Ku Klux Klan's underwriting gift and proffered announcement. (Tr. at 167.)
Ms. Bennett recognized Mr. Cuffley's request as a potentially high profile issue which could result in litigation. (Id. at 127.) Consequently, she contacted Dr. Driemeier and requested a decision from the Chancellor as to how to proceed. (Id. at 91.) Ms. Bennett recommended to Dr. Driemeier that KWMU deny the Ku Klux Klan's underwriting request; however, she did not explain her reasons for her recommendation. (Id. at 91, 154.) Dr. Driemeier told Chancellor Touhill of the Ku Klux Klan's request, but did not inform her of Ms. Bennett's recommendation. (Id. at 131, 154.) Dr. Driemeier wanted Chancellor Touhill to make her decision with an open mind. (Id. at 154.) Ms. Bennett did not speak with Chancellor Touhill about the proposed underwriting gift before the Chancellor made her decision. (Id. at 124.)
Chancellor Touhill rejected the Ku Klux Klan's offer to underwrite programming on KWMU. (Id. at 131, 133.) It was the only time that she had been asked to rule on the acceptability of an underwriting offer. (Id. at 132.) Chancellor Touhill testified that because the underwriting gifts must be publicly recorded, KWMU would be required to publicly acknowledge the Ku Klux Klan's gift and to read the Ku Klux Klan message on the air.[5] (Id. at 133, 135.) She further testified that her reasons for rejecting the Ku Klux Klan's proffer were based on business considerations, specifically the loss of revenue to the UMSL that would result from the Ku Klux Klan's message being read on the air. (Id. at 135-36.) This conclusion was based on her twenty-four years' experience in college administration. (Id. at 145, 149.) Chancellor Touhill testified that the views of an organization should not be the basis for KWMU's accepting or rejecting that organization's underwriting offer.
Chancellor Touhill listed several specific economic consequences that would be suffered by UMSL if the Ku Klux Klan's underwriting offer was accepted. First, a recurrent donor to the University is an African-American who suffered indignation in World War II because of his race. (Id. at 134.) He vowed to assist his race in overcoming this prejudice if he achieved financial success. He did, and has contributed $8.9 million to UMSL. (Id. at 146.) Chancellor Touhill feared the loss of this man's financial support to UMSL if the Ku Klux Klan message ran on air. This donor is also responsible for recruiting other donors in the community; thus, his withdrawn support would have adversely affected the support of others. (Id. at 134.) Second, UMSL is a relatively new institution and a member of a university system that is sensitive to its past history of *580 resisting integration. (Id.) UMSL now enrolls and graduates more African-American students than any other college in the State. (Id.) Permitting the Ku Klux Klan to make an announcement on KWMU would be a reverse step in UMSL's efforts to maintain a diverse student population. Third, as the Chancellor of UMSL, its primary spokesperson, and most visible and high-profile representative, she is a member of a number of the region's civic and corporate boards whose objectives are to create and maintain a "level playing field" for African-Americans in the community. KWMU's association with the Ku Klux Klan would be detrimental to these efforts.
Chancellor Touhill conservatively estimated that if the underwriting was accepted, 25% of the 1,565 African-American students at UMSL would leave the school, resulting in a loss of approximately $920,000.00 to UMSL, and 10% of the 9,142 white students would leave, resulting in a loss of $2.1 million. (Id. at 147-48.) She also estimated that of the $10 million in annual gifts to UMSL, $2 million would be lost as a result of the Ku Klux Klan underwriting gift. (Id.)
Thus, UMSL would lose, according to the Chancellor's undisputed, conservative estimates, approximately $5 million if the Ku Klux Klan's underwriting gift was accepted.

Discussion
Petitioners argue in their motion for summary judgment that KWMU's underwriting practices make it a designated public forum, and consequently, the Ku Klux Klan's underwriting offer, which was consistent with KWMU's guidelines, had to be accepted. Petitioners further argue that Respondents (i) impermissibly rejected this offer based on their perception of Petitioners' social and political views, (ii) employed an unconstitutionally overbroad and arbitrary editorial discretion, and (iii) had inherently unconstitutional reasons, i.e., reasons based on their perception of Petitioners' viewpoints, for excluding the Ku Klux Klan from KWMU's underwriting program. Respondents counter that KWMU is not a designated public forum.[6] Both parties argue in their respective motions for summary judgment that the Supreme Court's recent decision in Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, ___, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998), compels entry of judgment in their favor.
Standard for Review. Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citations omitted).
The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party. See Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir.1993).
Conclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine *581 issue of fact sufficient to overcome a summary judgment motion properly supported by depositions or affidavits. See Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir.1984). Moreover, where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. See Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir.1990).
The Medium, It is undisputed that KWMU is owned and operated by the Curators of the University of Missouri and that Ms. Bennett and Chancellor Touhill were acting in their capacity as employees of the University when rejecting the Ku Klux Klan's request for underwriting.
It is well settled that the government is not required to allow all forms of speech on property that it owns and controls. See International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). "Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." Id. Accordingly, "[r]ecognizing that the Government, `no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (quoting Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)). "`[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum.'" See Forbes, 523 U.S. at ___, 118 S.Ct. at 1641 (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. 3439) (alterations in original).
"Traditional public fora are defined by the objective characteristics of the property" and "are open for expressive activity regardless of the government's intent." Id. Exclusion is permitted only to the extent necessary to serve a compelling state interest. Id. Designated public fora are created by intentional governmental action, i.e., by the government operating a nontraditional public forum for public discourse. Id. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." Id. (citing Cornelius, 473 U.S. at 802, 105 S.Ct. 3439; United States v. Kokinda, 497 U.S. 720, 726-27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). In deciding what is a designated public forum, "`the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.'" Id. (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. 3439). And, either a nonpublic fora or no fora at all is created when the property is neither a traditional public forum nor a designated public forum. Id. The government can, however, "restrict access to nonpublic forum `as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Id. (quoting Cornelius, 473 U.S. at 800, 105 S.Ct. 3439) (alteration in original).
In Forbes, the Supreme Court was presented with a dispute arising out of a stateowned public television broadcasting station's refusal to allow an independent candidate with little popular support to participate in a broadcasted debate of candidates for a congressional seat in a particular district. The Court noted that the public forum doctrine first arose in the context of streets and parks. Id. 523 U.S. 666, 118 S.Ct. at 1639. These "quintessential public forums" have been "`held in trust for use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)).
*582 Distinguishing between broadcast medium and other forms of speech, the Court held that the forum doctrine "should not be extended in a mechanical way to the very different context of public television broadcasting." Forbes, 523 U.S. at ___, 118 S.Ct. at 1639.[7] In such context, "broad rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." Id.
The Forbes Court analyzed the broadcast medium and claims of access under the precedents of Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (must-carry provisions of the Cable Television Act are content neutral and are, therefore, subject to an intermediate level of scrutiny; less rigorous standard of scrutiny reserved for broadcast regulation should not be extended to cable television); FCC v. League of Women Voters of California, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (Public Broadcasting Act violated the First Amendment by restricting non-commercial educational stations that receive funds from the Corporation For Public Broadcasting from engaging in editorializing); and Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (CBS). In CBS, the Court detailed the legislative history of the Radio Act of 1927, which in its original form contained language deeming radio licensees as common carriers in interstate commerce. Id. 412 U.S. at 106, 93 S.Ct. 2080. The Court explained why this provision was excluded from the final version of the Act: "[s]ince it was physically impossible to provide time for all viewpoints ... the right to exercise editorial judgment was granted to the broadcaster." Id. 412 U.S. at 111, 93 S.Ct. 2080.[8] "The fundamental distinguishing characteristic of the new medium of broadcasting that, in our view, has required some adjustment in First Amendment analysis is that `[b]roadcast frequencies are a scarce resource [that] must be proportioned out among applicants.'" League of Women Voters, 468 U.S. at 377, 104 S.Ct. 3106 (quoting CBS, 412 U.S. at 101, 93 S.Ct. 2080) (alterations in original). "The justification for our distinct approach to broadcast regulations rests upon the unique physical limitations of the broadcast medium." Turner, 512 U.S. at 637, 114 S.Ct. 2445. "As a general matter, there are more would-be broadcasters than frequencies available in the electromagnetic spectrum." Id.
The unique nature of the broadcast medium results in "the application of a less rigorous standard of First Amendment scrutiny to broadcast regulation." Id. Acknowledging that some criticism has been directed to the "scarcity rationale," the Court "declined to question its validity." Id. 512 U.S. at 638, 114 S.Ct. 2445. "As we said in Red Lion `[w]here there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unbridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.'" Id. (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 388, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)) (alteration in original).
Following the map drawn by these three decisions, the Court held that "[a]s a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination." Forbes, 523 U.S. at ___, 118 S.Ct. at 1639. To hold otherwise, would render broadcasters' normal *583 programming decisions "particularly vulnerable" to these claims because "even principled exclusions rooted in social journalistic judgment can often be characterized as viewpoint-based." Id. Claims of access in the area of broadcasting are counterproductive because if given "sweeping application" courts would be required to oversee the daily operations of broadcasters, determining whether various viewpoints are presented sufficiently or provided enough time on air. Id. 523 U.S. 666, 118 S.Ct. at 1640 (citing CBS, 412 U.S. at 127, 93 S.Ct. 2080). This would place control over how public issues are treated on air from the licensees who are accountable for broadcast performance to private individuals, such as Petitioners. Id. (citing CBS, 412 U.S. at 124, 93 S.Ct. 2080). "In effect, we would `exchange "public trustee" broadcasting, with all its limitations, for a system of self-appointed editorial commentators.'" Id. (quoting CBS, 412 U.S. at 125, 93 S.Ct. 2080). The "limitations" include obligations imposed on the broadcaster in order to acquire and maintain a license to broadcast. "Among the broadcaster's responsibilities is the duty to schedule programming that serves the `public interest, convenience, and necessity.'" Id. 523 U.S. 666, 118 S.Ct. at 1639 (quoting 47 U.S.C. § 309(a)).[9] The renewal of a license to broadcast may be denied if the licensee failed in the preceding term of its license to "serve the public interest, convenience, and necessity." 47 U.S.C. § 309(k)(1)(A).
"In the delicate balancing historically followed in the regulation of broadcasting Congress and the Commission could appropriately conclude that the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many." CBS, 412 U.S. at 125, 93 S.Ct. 2080. These distinctions between broadcasting and other forms of speech compelled the Supreme Court to conclude that "public broadcasting does not lend itself to scrutiny under the forum doctrine[,]" with the narrow exception to the rule presented by candidate debates. Forbes, 523 U.S. at ___, 118 S.Ct. at 1640.
The Court cited two reasons for carving out the exception in Forbes and engaging in an examination of the type of fora presented by candidate debates.[10] Neither reason is present in the instant case. First, the Court's finding that a debate permits candidates to express their view with "minimal intrusion by the broadcaster" has questionable application in the instant case. The evidence before the Court is that KWMU personnel review the underwriting text provided by each potential donor, amends and edits the text when it does not meet the underwriting policies of the station, and, in some instances, writes the entire text of the donor's announcement. It is clear that the views expressed by the donors are not those of the station; however, it is a KWMU employee who reads the announcement  not the donor. In a debate, it is the candidate who speaks and who prepares his or her text which is generally not subject to the broadcaster's editing. Second, while candidate debates are of "exceptional significance in the electoral process," Forbes, 523 U.S. at ___, 118 S.Ct. at 1640, underwriting announcements hold a less significant position in the electoral process and, standing alone, do not enjoy the revered tradition in the broadcasting field as do candidate debates.
Petitioners argue that "Forbes teaches that while public broadcasting `as a general matter does not lend itself to scrutiny under the forum doctrine,' the broadcaster can exercise its editorial discretion to designate certain portions of its programming as various types of public fora." (Mem. at 2.) The Court reads a different lesson in Forbes: public broadcasting, because of the unique nature of the medium, does not, with the one exception of candidate debates, "lend itself to scrutiny under the forum doctrine." Forbes, 523 U.S. at ___, 118 S.Ct. at 1640 (emphasis added). Accordingly, the enhanced underwriting program *584 implemented at KWMU to raise funds for its operation is not a forum.
Petitioners further argue that enhanced underwriting program is a revenue-generating operation at KWMU and therefore does not enjoy the protection granted in Forbes to editorial discretion. The underwriting program is more properly analogous to advertising space on buses, Petitioners contend, than to the broadcast programming of Forbes. Again, Petitioners misapprehend the scope of Forbes. Broadcasters have a finite amount of air time; what is broadcast during that time is a matter of discretion. If the broadcasters fail to air programs that serve the "public interest, convenience, and necessity," their license will not be renewed. To finance their programs, KWMU exchanges a fifteen second announcement for funds. The text of that announcement and who may provide the funds are subject to regulation and to KWMU's guidelines. The announcement is read by KWMU's employees. To interpret the enhanced underwriting program as a forum would be to engage the courts in the day to day operation of the radio station  an engagement prohibited by Forbes.
For the foregoing reasons, the Court finds that KWMU is not required to accept the Ku Klux Klan's offer to underwrite "All Things Considered."
The Fora. Were the Court to engage, however, in a forum analysis, the Court would not find, as urged by Petitioners, that KWMU's enhanced underwriting program is a designated public forum.
"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. Moreover, the government does not create a designated public forum when it reserves eligibility to a class of speakers who must obtain permission to use the property. Forbes, 523 U.S. at ___, 118 S.Ct. at 1642; Perry Educ. Ass'n, 460 U.S. at 47, 103 S.Ct. 948. "In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." Cornelius, 473 U.S. at 801, 105 S.Ct. 3439.
Petitioners cite the following cases as authority for their argument that KWMU created a designated public forum by accepting enhanced underwriting gifts: Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (denial of funds to university student organization which published newspaper with religious editorial viewpoints violated First Amendment; guidelines for funding did not prohibit religion as subject matter but selected for disfavored treatment journalistic efforts with religious editorial viewpoints); International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (airport authority's prohibition on solicitation of contributions inside airport terminal, a nonpublic forum, was reasonable); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (exclusion of religious groups from university's open forum policy, making university's facilities generally available for student group activities, violated religious groups' First Amendment rights); Burnham v. Ianni, 119 F.3d 668 (8th Cir.1997) (removal of photographs of professors with objects related to their academic interests from university department display case violated professors' First Amendment rights); New York Magazine v. Metro Transp. Auth., 136 F.3d 123 (2nd Cir.1998) (public transit authority's refusal to display magazine's advertisement using mayor's name to promote commercial product on buses, designated public forum, violated magazine's First Amendment rights); Air Line Pilots Ass'n Int'l v. Dept. of Aviation of the City of Chicago, 45 F.3d 1144 (7th Cir.1995) (city's rejection of union's advertisement critical of airport from display cases at airport, a public forum, violated union's First Amendment rights); and Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth., 767 F.2d 1225 (7th Cir.1985) (transit authority's refusal to rent space in advertising space on system, a public forum, to Planned Parenthood group violated that group's First Amendment rights). In each case, Petitioners argue, the government's exclusion of a group from its property *585 traditionally available for public expression was subjected to highest scrutiny.
Significantly, the foregoing cases did not involve broadcasting or a similarly scarce resource. The Supreme Court has been reluctant to force or order publishers or broadcasters into accepting forms of speech. See e.g. Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. ___, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (state-owned television station's exclusion of a candidate from a televised debate was a viewpoint neutral exercise of journalistic discretion); FCC v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (section of the Public Broadcasting Act forbidding noncommercial educational stations which received funds from the Corporation for Public Broadcasting from engaging in editorializing violated the First Amendment); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (state statute requiring newspapers that criticized a public candidate to provide free space for that candidate's reply violated newspapers' First Amendment rights); Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (FCC ruling allowing broadcasters not to accept editorial advertisements did not violate advertisers' First Amendment Rights).
The uncontradicted testimony is that employees at KWMU review each request for underwriting. The text of the announcement is reviewed and edited when KWMU determines that a change is necessary. Permission from KWMU is required in order to underwrite a program. The underwriting announcement is read by KWMU employees on air and is not read by a representative of the underwriter. KWMU is authorized to accept underwriting funding but is required to identify the underwriters on air. See 47 U.S.C. § 317(a)(1). The underwriting announcement is limited to fifteen seconds and may not interrupt regular programming. See 47 C.F.R. § 73.503(d). KWMU is precluded from accepting advertising over its airways. See 47 U.S.C. § 399(b)(2). FCC regulations do not allow public radio stations to broadcast messages promoting or criticizing ballot issues nor is the station allowed to broadcast political announcements from candidates, except those running for federal office.
It is undisputed in the instant case that KWMU seeks underwriters to support the station. Indeed, the station has a whole division dedicated to seeking underwriters. Thus, it is arguable that the point of the underwriting program is to generate income, not to provide an underwriter with a forum. Nonetheless, in return for the donation, KWMU provides the underwriter with fifteen seconds of air time for a message. The underwriter is not, however, given carte blanche with that time and is subject to the restrictions noted above.
The foregoing restrictions demonstrate the inapplicability of a designated public forum designation to KWMU's underwriting policy. To demonstrate otherwise, Petitioners must establish that the government "intended to designate a place [KWMU] not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. Petitioners have failed to do so.
The Fifth Circuit Court of Appeals designated a state's adopt-a-highway program to be a nonpublic forum in State of Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075 (5th Cir.1995). The state had rejected the Ku Klux Klan's application to "adopt" a portion of a highway near a public housing project subject to a continuing desegregation order. The Court noted that the purpose of Texas' adopt-a-highway program was to allow citizens an opportunity to support the state highway department's efforts to control and reduce litter and was not to open the highway for "public discourse." Id. 58 F.3d at 1078. "Any opportunity for speech provided by the Program is peripheral to that central purpose. The government does not create a public forum merely by permitting some speech." Id. (citing Cornelius, 473 U.S. at 802, 105 S.Ct. 3439; Perry Educ. Ass'n, 460 U.S. at 47, 103 S.Ct. 948.) The Court considered several factors when it concluded that the adopt-a-highway program was a nonpublic forum. As noted above, the primary purpose of the program was to keep the highways litter-free, it was not to be a forum for *586 expressive activity.[11]Id. Moreover, as noted by the Court, the "State of Texas restricts and controls the size and content of the signs posted at the ends of the adopted miles." Id. (regulatory citation omitted). Persons who were not state officials could not erect their own signs without state authorization. Id. 58 F.3d at 1079. The Court held that "[s]uch limitations on the quantity and content of speech are indicative of an intent to maintain a nonpublic forum." Id. (citing Cornelius, 473 U.S. at 800, 105 S.Ct. 3439). Additionally, the State of Texas restricted participation in the program to certain entities, excluding individuals and political organizations, and required that all applications had to be approved by the state's department of transportation. Id. But cf. Knights of the Ku Klux Klan v. Arkansas State Highway and Transp., Dep't, 807 F.Supp. 1427 (W.D.Ark. 1992) (state's denial of Knights of the Ku Klux Klan's application to participate in state's adopt-a-highway program, a public forum, violated that organization's First Amendment rights).
It is undisputed that KWMU is not a traditional public forum; and, for the reasons set forth above, the Court rejects Petitioners' argument that it is a designated public forum. Accordingly, the property is, at best, a nonpublic forum.[12] "The government can restrict access to a nonpublic forum `as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view.'" Forbes, 523 U.S. at ___, 118 S.Ct. at 1641 (quoting Cornelius, 473 U.S. at 800, 105 S.Ct. 3439) (alteration in original).
"To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." Forbes, 523 U.S. at ___, 118 S.Ct. at 1643 (citing Cornelius, 473 U.S. at 800, 105 S.Ct. 3439).
The evidence is undisputed that Chancellor Touhill made the decision to refuse Petitioners' underwriting gift based upon business and economic reasons and not because she was attempting to suppress Petitioners' views. Chancellor Touhill is an experienced college administrator. Her decision to refuse Petitioners' offer to underwrite a program was based upon her expertise as a college administrator and Chancellor. The reason for the rejection is similar to the rationale used by the Arkansas Educational Television Commission in Forbes. In that case, the Court found that the television station's refusal to allow a candidate in a debate was not viewpoint based. 118 S.Ct. at 1643-44. The Court specifically found that the Commission's executive director determined that: (1) the Arkansas voters did not consider Forbes a serious candidate; (2) the national news organizations did not plan to run Forbes' name in results on election night and did not consider him a serious candidate; and (3) Forbes had little financial support and no headquarters other than his home. Id. "It is, in short, beyond dispute that Forbes was excluded not because of his viewpoint but because he had generated no appreciable public interest. There is no substance to Forbes' suggestion that he was excluded because his views were unpopular or out of the mainstream. His own objective lack of support, not his platform, was the criterion." Id. 118 S.Ct. at 1644, 523 U.S. 666 (interim citation omitted).
In the instant case, Chancellor Touhill determined that accepting underwriting from the Ku Klux Klan would result in a loss of financial support from the school's patrons. She considered the makeup of the school's enrollment and through her experience and knowledge determined that there would be a loss of enrollment and, therefore, a loss of money to the University if she accepted the Ku Klux Klan's underwriting gift. She testified as to the approximate amount of financial support that UMSL would lose if KWMU *587 were to read the Ku Klux Klan's underwriting message on the air. Petitioners did not challenge the figures. As Petitioners note, however, there is no evidence that Chancellor Touhill collected empirical data to support her position. Nor was there such evidence in Forbes.
The Court finds that KWMU's decision was not viewpoint based.

Conclusion
Petitioners vigorously argue that the general unpopularity of their viewpoint and a misperception that their viewpoint is linked with violence should not, consistent with their First Amendment rights, preclude them from underwriting a program on a public radio station, specifically "All Things Considered" on KWMU. Arguments such as Petitioners' assist the courts in safeguarding the First Amendment. As important as these arguments are, however, Petitioners are not guaranteed access to all medium simply because their viewpoints are unpopular. They are not guaranteed access to a public radio station, given the unique nature of the medium. For the reasons set forth above, the Court finds that KWMU is not a forum and the rejection of Petitioners' request to underwrite a program on KWMU is not a violation of their First Amendment rights.
Accordingly,
IT IS HEREBY ORDERED that Respondents' Motion for Summary Judgment is GRANTED [Doc. 40]; and
IT IS FURTHER ORDERED that Petitioners' Motion for Summary Judgment [Doc. 44] is DENIED.
A separate Judgment shall accompany this Memorandum and Order.

JUDGMENT
In accordance with the Memorandum and Order filed this date,
IT IS HEREBY ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of Respondents Patricia Bennett, Curators of the University of Missouri, Theodore C. Beckett, Paul T. Combs, Adam B. Fischer, Mary S. Gillespie, Fred L. Hall, Jr., Malaika B. Horne, John A. Mathes, Paul W. Steele, and Hugh E. Stevenson and against Petitioners Knights of the Ku Klux Klan, Realm of Missouri, and Michael Cuffley.
NOTES
[1] The Board of Curators, also named as a respondent, was previously dismissed by the Court. (See Order of July 13, 1998.)
[2] References to "Tr." are to the transcript of the August 1998 evidentiary hearing on Petitioners' Motion for Preliminary Injunction.
[3] Unless otherwise noted, the exhibits referred to in this Memorandum and Order were submitted at the August 1998 evidentiary hearing.
[4] The underwriting guidelines provide, in relevant part, as follows:

On-air Identification of Underwriters
1.) An underwriter of programming is required by the FCC to be identified by its legal or their recognized name of operation.
2.) An entire underwriting announcement may not exceed 15 seconds, including underwriters [sic] name and name of program sponsored.
3.) On-air announcements may include:
(a) The name of the organization[.]
(b) A logogram or slogan that identifies but does not promote. Logograms and slogans must comply with the rules outlined in FCC 86-161.
(c) Location[.]
(d) Value neutral descriptions of a product line or service.
(e) Trade names, product or service listings that aid in identifying the donor.
4.) On-air announcements may not include:
(a) A call to action to use a product or service, or inducement to buy, sell, rent of [sic] lease or visit.
(b) Qualitative or comparative description of a company, its products or services.
(c) Pricing information or indication of associated savings or value.
(d) Logograms or slogans that contain comparative or qualitative descriptions or are promotional in nature.
(e) More than three trade names, product or service listing in a single announcement.
(f) Any form of misrepresentation.
(g) The words "you," "your" and "we." Use of these words implies a relationship between the funder and the listener, rather than just between the funder and KWMU.
5.) No pre-produced underwriting announcements, audio logos, or musical themes will be accepted.
7.) [sic] KWMU airs no more than three local underwriter announcements at each scheduled break.
8.) Under FCC rules, regulations [sic] and policies, KWMU has a duty to determine what programming will best serve the public interest. The selection of spokespersons, format, subject matter, duration and scheduling of broadcast material is a matter within KWMU's discretion. KWMU reserves the right to reject any material.
(Pet'rs.Ex. 2.)
[5] Title 47 U.S.C. § 317(a)(1) provides, in relevant part:

All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged to or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, such person...
[6] NPR also relies on the Forbes decision in the amicus curiae brief it has submitted on behalf of Respondents.
[7] For purposes of a First Amendment analysis, public radio and public television are treated the same, see Schneider v. Indian River Community College Foundation, 875 F.2d 1537, 1541 (11th Cir.1989), as are television and radio generally, see McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 338 n. 3, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
[8] Senator Dill, the principal architect of the Radio Act of 1927, offered the amendment eliminating the common carrier obligation, explaining:

When we recall that broadcasting today is purely voluntary, and the listener-in pays nothing for it, that the broadcaster gives it for the purpose of building up his reputation, it seemed unwise to put the broadcaster under the hampering control of being a common carrier and compelled to accept anything and everything that was offered him so long as the price was paid.
CBS, 412 U.S. at 106, 93 S.Ct. 2080 (quoting 67 Cong. Record 12502) (emphasis added).
[9] Title 47 U.S.C. § 309(a) requires that the FCC determine if "public interest, convenience, and necessity" would be served by granting an application for a radio station license.
[10] The Supreme Court determined that the special characteristics of candidate debates supported a conclusion that the broadcast debate was the least restrictive fora  the nonpublic forum. Forbes, 118 S.Ct. at 1640-41.
[11] The Court notes that in the Texas case the extent of the "discourse" was simply the organization's name on a sign at the beginning and at the end of the adopted stretch of highway, as compared to the enhanced underwriting permitted by KWMU.
[12] As discussed above, however, the Court first finds that KWMU is not a forum at all.