# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1168

_____

Knights of the Ku Klux Klan, Realm    *
of Missouri, and Michael Cuffley,     *
                *
     Appellants,         *
                *
    v.             *
                *
Curators of the University of Missouri;   *
Patricia Bennett, in her official capacity   *
as general manager of KWMU Radio    *
only; Theodore C. Beckett, in his     *
official capacity as Curator of the     *
University of Missouri; Paul T. Combs,   *
in his official capacity as Curator of the   *
University of Missouri; Adam B. Fischer,*
in his official capacity as Curator of the   *   Appeal from the United States
University of Missouri; Mary S.      *   District Court for the
Gillespie, in her official capacity as    *   Eastern District of Missouri
Curator of the University of Missouri;   *
Fred L. Hall, Jr., in his official capacity   *
as Curator of the University of Missouri; *
Malaika B. Horne, Dr., in her official   *
capacity as Curator of the University of   *
Missouri; John A. Mathes, in his official *
capacity as Curator of the University of   *
Missouri; Paul W. Steele, in his official   *
capacity as Curator of the University of   *
Missouri; Hugh E. Stephenson, Jr., Dr.,   *
in his official capacity as Curator of the   *
University of Missouri,        *
                *

                    Appellees.                    *
                                                  *
American Civil Liberties Union of                 *
Eastern Missouri,                                 *
                                                  *
          Amicus on Behalf of Appellants.         *
                                                  *
National Public Radio, a/k/a                       *
National Public Radio, Inc.,                      *
                                                  *
          Amicus on Behalf of Appellees.          *

                        _____

                Submitted:  September 16, 1999

                    Filed:   February 17, 2000
                        _____

Before McMILLIAN, MURPHY, and TUNHEIM,[1] Circuit Judges.
                        _____

McMILLIAN, Circuit Judge.

          The Knights of the Ku Klux Klan, Realm of Missouri ("Missouri KKK"), and Michael Cuffley, the state coordinator for the Missouri KKK (together "appellants"), appeal from a final order entered in the United States District Court[2] for the Eastern District of Missouri granting summary judgment in favor of the individual Curators of the University of Missouri and Patricia Bennett, general manager of the radio station

---

          [1] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

          [2] The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri.

KWMU (together "appellees"). See Knights of the Ku Klux Klan, Realm of Missouri v. Bennett, 29 F. Supp. 2d 576 (E.D. Mo. 1998). For reversal, appellants argue that the district court erred in holding that, in light of certain facts not genuinely disputed, appellees' rejection of the Missouri KKK as an underwriter violated neither the First Amendment nor the Equal Protection Clause of the Fourteenth Amendment. For the reasons discussed below, we affirm the order of the district court.

## Jurisdiction

Jurisdiction in the district court was proper based upon 28 U.S.C. § 1343. Jurisdiction in the court of appeals was proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

## Background

KWMU is a not-for-profit public broadcast radio station located on the campus of the University of Missouri at St. Louis ("UMSL"). KWMU is owned and operated by The Curators of the University of Missouri, a public corporation established under state law, see Mo. Rev. Stat. § 172.020 (1999), and licensed by the Federal Communications Commission ("FCC") to run the station. See 29 F. Supp. 2d at 577. The Chancellor of UMSL, Dr. Blanche Touhill, is responsible for overseeing KWMU's operation. See Appellees' Appendix at 249. Patricia Bennett, the director and general manager of KWMU, supervises the station's administration, development, engineering, programming, and sales divisions on a daily basis. Bennett also communicates weekly with Dr. Donald Dreimeier, Deputy to the Chancellor of UMSL, who in turn reports to Touhill. See Transcript of Dist. Ct. Evidentiary Hearing at 7, 9 (Aug. 12, 1998) [hereinafter "Tr."].

To help fund the station, KWMU operates an "enhanced underwriting" program within its sales division. See id. at 30, 32. Pursuant to federal law, the station

-3-

acknowledges on air any individual or group source of funding for a particular broadcast matter. See 47 U.S.C. § 317(a)(1) (requiring on-air announcement at time of sponsored broadcast identifying source of "any money, service or other valuable consideration . . . directly or indirectly paid, or promised to or charged or accepted by" the broadcasting station). Contributors of such funds are referred to as "donors" or "underwriters." See, e.g., *In re* Commission Policy Concerning the Noncommercial Nature of Educational Broadcasting, Public Notice, 7 F.C.C.R. 827 (1992) ("1992 Order"). Although federal law forbids noncommercial educational FM broadcasters like KWMU from broadcasting "advertisements," see 47 U.S.C. § 399b; 47 C.F.R. § 73.503(d), public broadcasters are permitted to "enhance" or expand the scope of donor or underwriter acknowledgments by including (1) logograms or slogans which identify the underwriter but do not promote it, (2) location information on the donor, (3) value neutral descriptions of the underwriter's product line or service, and (4) donor brand names, trade names, and product or service listings. See *In re* Commission Policy Concerning the Noncommercial Nature of Educational Broadcasting Stations, 97 F.C.C.2d 255, 263 (1984) ("1984 Order"). Typically, the announcement is a fifteen-second message, drafted by the underwriter or KWMU staff. See Tr. at 38-39. All scripts are reviewed and edited by station management to ensure compliance with federal law and regulations as well as KWMU underwriting guidelines,[3] because

---

[3] KWMU's underwriting guidelines provide, in relevant part, as follows:

On-air Identification of Underwriters
1.) An underwriter of programming is required by the FCC to be identified by its legal name or [its] recognized name of operation.
2.) An entire underwriting announcement may not exceed 15 seconds, including underwriters['] name and name of program sponsored.
3.) On-air announcements may include:
    (a) The name of the organization[.]
    (b) A logogram or slogan that identifies but does not promote. Logograms and slogans must comply with the rules outlined in FCC 86–161.

-4-

UMSL (as the licensee of KWMU) is ultimately liable for all transmissions.  See, e.g., 47 U.S.C. § 503(b)(1), (b)(2)(A) (forfeiture provisions); Russellville Educ. Broadcast Found., Licensee of KMTC (FM), Letter, DA 99–1280 (July 1, 1999) (imposing $2500 forfeiture penalty for impermissible advertisements); Penfield Communications, Inc.,

<div style="border-top: 1px solid; width: 40%"></div>

  (c) Location[.]
  (d) Value neutral descriptions of a product line or service.
  (e) Trade names, product or service listings that aid in identifying the donor.
 4.) On-air announcements may not include:
  (a) A call to action to use a product or service, or inducement to buy, sell, rent [or] lease or visit.
  (b) Qualitative or comparative description of a company, its products or services.
  (c) Pricing information or indication of associated savings or value.
  (d) Logograms or slogans that contain comparative or qualitative descriptions or are promotional in nature.
  (e) More than three trade names, product[s] or service listing[s] in a single announcement.
  (f) Any form of misrepresentation.
  (g) The words "you," "your" and "we."  Use of these words implies a relationship between the funder and the listener, rather than just between the funder and KWMU.
 5.) No pre-produced underwriting announcements, audio logos, or musical themes will be accepted.
 [6.]) KWMU airs no more than three local underwriter announcements at each scheduled break.
 [7.]) Under FCC rules, [regulations] and policies, KWMU has a duty to determine what programming will best serve the public interest. The selection of spokespersons, format, subject matter, duration and scheduling of broadcast material is a matter within KWMU's discretion.  KWMU reserves the right to reject any material.

Appellants' Appendix at 109-11.

Licensee of KRTM (FM), Memorandum Opinion & Order & Forfeiture Order, DA 98–2407 (Nov. 25, 1998) (imposing $4000 forfeiture penalty for same reasons).

As general manager, Bennett designates the percentage of total air time available for underwriting spots as well as the amount of underwriting time allotted to particular programs. See Tr. at 21-22. Bennett accepts donor funds from, and approves accompanying messages of, approximately thirty underwriters per week. See id. at 122. As a matter of course, Bennett does not examine the philosophy or policies of each potential donor. See id. at 62. Nonetheless, prior to the institution of this action, Bennett has rejected financial support from several potential underwriters. See 29 F. Supp. 2d at 578 (noting rejection of underwriting requests from a group called "Ultimate Fighting Championships," a political entity titled "The American Friends Service Committee," and an establishment known to be "a house of ill repute").

Some time prior to September 24, 1997, Michael Cuffley[4] contacted KWMU by telephone and requested information on underwriting several fifteen-second spots for NPR's "All Things Considered" program. See Tr. at 160-61. Cuffley testified that he enjoyed the program, wanted to support KWMU, and hoped to attract more highly educated people to his organization. See id. at 159-60. Cuffley did not initially identify

---

[4] As state coordinator for the Missouri KKK, Cuffley is the highest ranking official of that organization. Cuffley's duties for the Missouri KKK include speaking at public events, planning activities, and coordinating activities with other Ku Klux Klan organizations around the country. See Tr. at 157-59.

Although not "officially" tied to any other Ku Klux Klan groups, the Missouri KKK subscribes to the general principles of the Ku Klux Klan and traces its roots back to 1865 and the aftermath of the Civil War. As such, the Missouri KKK admits only American-born, white Christians, does not openly advocate violence, but does participate in "cross-lightings" at which members wear traditional white robes and hoods. Cuffley himself has participated in over a hundred such cross-lightings. See id. at 170-71.

himself or his organization.  See id. at 161.  A KWMU sales representative quoted Cuffley the underwriting costs for not-for-profit organizations and requested his telephone number, advising Cuffley that a sales representative would contact him at a later date.  See id. at 161, 163.  At that point, no agreement was reached between KWMU and Cuffley.

On September 24 and 29, 1997, Cuffley wrote to KWMU requesting the opportunity for the Missouri KKK to sponsor four segments of NPR's "All Things Considered."  See 29 F. Supp. 2d at 578.  Cuffley submitted the following message to KWMU to be read as an underwriting acknowledgment:

> The Knights of the Ku Klux Klan, a White Christian organization, standing up for rights and values of White Christian America since 1865. For more information[,] please contact the Knights of the Ku Klux Klan, at P.O. Box 525[,] Imperial, Missouri[,] 63052.  Let your voice be heard!

Appellees' Appendix at 122.

Bennett contacted her immediate supervisor, Driemeier, and requested a decision from Chancellor Touhill regarding the Missouri KKK's proposed underwriting support.  Bennett recommended that KWMU refuse the funds but did not outline reasons for this recommendation.  See Tr. at 91, 153-54.  Driemeier told Touhill of the Missouri KKK's offer but did not inform her of Bennett's recommendation.  Prior to making her decision, Touhill did not speak with Bennett regarding the matter.  See id. at 124, 154.  No one had previously consulted Touhill regarding the acceptance or rejection of underwriting funds.  See id. at 132.

Touhill ultimately rejected the Missouri KKK's proposed underwriting gift. See id. at 131, 133.  At the district court evidentiary hearing, Touhill explained her decision as follows.  She first noted that KWMU was legally required to acknowledge donors on the air.  See id. at 133, 135.  Touhill anticipated that an acknowledgment of

the Missouri KKK as an underwriter would result in a significant loss of revenue to UMSL. Touhill specifically stated that these business and economic reasons, and not the views of the Missouri KKK, were the basis for her decision. See id. at 135-36.

In some detail, Touhill outlined the negative consequences of accepting underwriting funds from the Missouri KKK. First, Touhill believed Missouri KKK sponsorship would jeopardize future gifts from major African-American donors. See id. at 133-35. Based on her experience and interaction with these donors, Touhill predicted a twenty percent decline in annual gifts to UMSL, or a loss of some two million dollars per year. See id. at 148. Second, Touhill projected a drop in student enrollment if the Missouri KKK were accepted as an underwriter. Touhill estimated that twenty-five percent of the 1,565 African-American students at UMSL (and ten percent of the 9,142 white students) would leave the school, resulting in an annual loss of over three million dollars. See id. at 147-48. Finally, Touhill stated that KWMU's association with the Missouri KKK would counteract her efforts, both as the primary spokesperson for UMSL and as a member of multiple civic and corporate boards, in creating and maintaining a level playing field in the community for African-Americans. See 29 F. Supp. 2d at 580.

Based on Touhill's decision, Bennett wrote Cuffley on October 3, 1997, and informed him that KWMU would not accept underwriting funds from the Missouri KKK. See Appellants' Appendix at 79. Appellants subsequently filed this action in the district court, seeking injunctive and declaratory relief on their claim that appellees had violated their First and Fourteenth Amendment rights by refusing their request for program underwriting. The parties subsequently filed cross-motions for summary judgment. See 29 F. Supp. 2d at 577.

After a full hearing on the merits, the district court granted appellees' motion for summary judgment and denied appellants' cross-motion. The district court held that KWMU's enhanced underwriting program was not a forum for speech and therefore did

not implicate the First Amendment. See id. at 583-84. The district court initially noted that public broadcasters are not common carriers in interstate commerce, but rather licensed "public trustees," with the responsibility to "schedule programming that serves the public interest, convenience, and necessity." Id. at 582-83 (quoting Arkansas Educ. Television Comm'n v. Forbes, 118 S. Ct. 1633, 1639 (1998) (Forbes)) (internal citations omitted). Thus, the district court reasoned, Congress' decision to license broadcasters in such a manner indicated its preference that "the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many," Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 125 (1973) (CBS), and meant that public broadcasting "as a general matter does not lend itself to scrutiny under the forum doctrine," with the exception of political candidate debates. Forbes, 118 S. Ct. at 1640. The district court reasoned that, because this case did not fall within the scope of the exception outlined under Forbes, no forum examination was necessary. See 29 F. Supp. 2d at 583-84. The district court specifically rejected appellants' argument that the enhanced underwriting program, as a revenue-generating operation analogous to advertising space on public buses, did not "enjoy the protection granted in Forbes to editorial discretion." Id. at 584. The district court determined that broadcasters' finite amount of air time meant that anything broadcast during that time was a matter of discretion and was subject only to license, FCC, and internal restrictions. Otherwise, "[t]o interpret the enhanced underwriting program as a forum would be to engage the courts in the day to day operation of the radio station – an engagement prohibited by Forbes." Id. In the alternative, under a forum analysis, the district court held that KWMU's enhanced underwriting program was not a designated public forum and was, at best, a nonpublic forum in which rejection of the Missouri KKK as an underwriter was based on uncontradicted business and economic reasons and did not constitute an attempt to suppress the group's viewpoint. See id. at 586-87. This appeal followed.

## Discussion

We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. See Brandt v. Davis, 191 F.3d 887, 891 (8th Cir. 1999). Summary judgment is appropriate when it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "All facts are viewed in the light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences to be drawn from the facts." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982).

For reversal, appellants initially claim that the underwriting acknowledgments do not constitute government speech and therefore are not shielded from forum analysis. Appellants contend that Forbes does not "immunize all activities conducted in the name of public broadcasting from First Amendment scrutiny," but instead insulates only governmental speech and communicative activity. Reply Brief at 7. Specifically, appellants argue that the Forbes Court sought to protect from outside interference a public broadcaster's selection and presentation of third party speech within its broadcast programming. See Forbes, 118 S. Ct. at 1639 ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity . . . . Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts.") (citations omitted). Appellants assert that, although the station is normally engaged in such protected speech for the better part of its broadcast, KWMU "relinquishes its speaker's role and becomes a mere conduit of third party speech" through its enhanced underwriting program. Reply Brief at 8. Appellants note that, although KWMU initially exercises its editorial discretion by setting aside time for the broadcast of third party messages and later exerts some control over the content and form of underwriters' messages, KWMU admittedly does not investigate, promote, or vouch for the views expressed within the underwriting spot.

-10-

Thus, appellants argue, the underlying nature of the underwriter spots remains unchanged: the underwriting acknowledgments clearly express the speech and viewpoints of the underwriters, not KWMU.[5] Cf. Bryant v. Secretary of the Army, 862 F. Supp. 574, 580-81 (D.D.C. 1994) (Bryant) (finding that letters to editor published in military base newspaper "clearly d[id] not reflect government speech in any ordinary sense of the term" and thus Army's editorial regulation, which "touche[d] upon instances in which the Government is seeking to regulate speech," was not immunized from First Amendment challenges). Accordingly, this lack of government speech means that KWMU's enhanced underwriting program is afforded no insulation from forum analysis under Forbes.

Appellants further assert that the enhanced underwriting program is merely a revenue-generating operation without journalistic or editorial character and, as such, cannot claim protection from forum analysis under Forbes. Appellants claim that Forbes insulates only matters of editorial or journalistic discretion and that KWMU's exchange of airtime for funds is not of the journalistic or editorial quality protected by Forbes.[6] See Forbes, 118 S. Ct. at 1640 ("Claims of access under our public forum

---

[5] Appellants contend that the district court "confuse[d] the medium with the message," see Brief of Appellants at 41, by stressing the significance of a KWMU employee, rather than a donor representative, reading the underwriting announcement. See 29 F. Supp. 2d at 583. Appellants argue that the use of government employees to facilitate transmission to the public is irrelevant, as long as the messages are those of the underwriters and not of the government. See, e.g., Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148 F.3d 242 (3d Cir. 1998) (ads in public subway and railway stations presumably posted by government employees).

[6] *Amicus curiae* American Civil Liberties Union of Eastern Missouri ("ACLU") refines this argument by drawing a strict distinction between "programming" and "programming breaks" such as underwriting announcements. See, e.g., 47 U.S.C. § 399a(b) (requiring that sponsorship announcements not interrupt "regular programming"). ACLU contends that Forbes protection only extends to the editorial discretion involved in programming. See, e.g., Forbes, 118 S. Ct. at 1639 ("When a

-11-

precedents could obstruct the legitimate purposes of . . . broadcasters. Were the doctrine given sweeping application in this context . . . '[t]he result would be a further erosion of the journalistic discretion of broadcasters,' transferring 'control over the treatment of public issues from the licensees who are accountable for broadcast performance to private individuals.'") (quoting CBS, 412 U.S. at 124). Instead, KWMU's enhanced underwriting program was a "discrete and severable activity from KWMU's primary journalistic function . . . administered by sales people with business concerns, not journalists with editorial concerns." Brief for Appellants at 43. Appellants contend that this "selling" of airtime to underwriters is analogous to the sale of advertising spaces on or within public transit facilities. See, e.g., Planned Parenthood Ass'n v. Chicago Transit Auth., 767 F.2d 1225, 1227 (7th Cir. 1985) (finding transit authority's refusal to sell plaintiff advertising space on its buses and transit cars constitutionally impermissible). Moreover, the fact that KWMU requires a donation (or charges a fee) for the underwriting announcements does not "negate the possibility that the government" has created a forum. Airline Pilots Ass'n Int'l v. Department of Aviation, 45 F.3d 1144, 1155 (7th Cir. 1995); see also United Food & Comm. Workers Union, Local 1099 v. Southwest Ohio Reg. Transit Auth., 163 F.3d 341, 353-54 (6th Cir. 1998) ("[T]he goal of generating income by leasing ad space suggests that the forum may be open to those who paid the requisite fee."). Because "[e]nhanced underwriting is no more journalism than advertisements on the outside of buses are transportation," appellants argue that the district court misapprehended the scope of Forbes and thereby erred in refusing to apply forum analysis to KWMU's enhanced underwriting program. Brief for Appellants at 42.

---

public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity."). Based on this narrow reading of Forbes, ACLU argues that programming breaks are not of adequate journalistic caliber and thus forum analysis is required.

Appellants additionally argue that courts can properly apply forum analysis under Forbes where the broadcaster intentionally sets aside time for the presentation of third party views. Appellants imply that, although "the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming," Forbes, 118 S. Ct. at 1640 (emphasis added), broadcasters may create fora through their own intentional, voluntary actions. For example, in the context of candidate debates, the Forbes Court specifically noted that forum analysis was appropriate because the broadcasting activity was by design a forum for the candidates' political speech, "where the views expressed were those of the candidates, not [the broadcaster's] own." Id. Appellants argue that KWMU has similarly provided affirmative public access to its airwaves by dedicating airtime to the specific purpose of transmitting underwriter speech in exchange for underwriting funds. Accordingly, appellants contend that the district court should have analyzed KWMU's voluntarily created, enhanced underwriting program under the forum doctrine. We disagree.

We reiterate Forbes' admonition that "[h]aving first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical way to the very different context of public television broadcasting." Id. at 1639.[7] Although open access and viewpoint neutrality may be compatible with the intended aims of streets and parks, such forum requirements are for the most part inapplicable in the context of public broadcasting, where substantial discretion is accorded to broadcasters with respect to the daily operation of their stations. See id. ("[B]road rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic

---

[7] Forbes specifically dealt with the arena of public television broadcasting. However, for the purposes of First Amendment analysis, public radio and public television are ordinarily treated the same, see Schneider v. Indian River Community College Found., 875 F.2d 1537, 1541 (11th Cir. 1989) (Schneider), as are television and radio generally. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 637-38 (1994) (Turner).

-13-

purpose and statutory obligations."). Instead of being compelled to open their facilities "on a nonselective basis to all persons wishing to talk about public issues," CBS, 412 U.S. at 105, public broadcasters enjoy the "widest journalistic freedom" consistent with their statutory obligations to broadcast material serving the "public interest, convenience, and necessity." Id. at 110; 47 U.S.C. § 309(a). Because broad application of the forum doctrine in this context would require "oversee[ing] far more of the day-to-day operations of broadcasters' conduct, deciding such questions as whether a particular individual or group has had sufficient opportunity to present its viewpoint and whether a particular viewpoint has already been sufficiently aired," CBS, 412 U.S. at 127, "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine." Forbes, 118 S. Ct. at 1640. Against this backdrop, we reject appellants' principal contention that the district court erred in determining that KWMU's enhanced underwriting program was not a forum.

First and foremost, KWMU's underwriting acknowledgments constitute governmental speech on the part of UMSL. Contrary to appellants' contentions, the central purpose of the enhanced underwriting program is not to promote the views of the donors, but to acknowledge "any money, service, or other valuable consideration . . . directly or indirectly paid, or promised to or charged or accepted by" the station with respect to the broadcast of any matter. 47 U.S.C. § 317(a)(1). In other words, KWMU's underwriting announcements are federally-mandated sponsorship identifications, in which UMSL "speaks" by airing its acknowledgments of funds received from certain parties to pay for specific KWMU broadcasts. Because KWMU must by law publicly advise its listeners as to the sources of funds "accepted" for its broadcasts, UMSL's decision to accept or reject the funds of underwriters is itself a governmental decision to speak or remain silent.[8] Cf. Muir v. Alabama Educ.

_____

[8] Even if KWMU were not legally required to acknowledge its underwriters, UMSL as the licensee of the broadcaster arguably still has the discretion to reject the underwriting funds in the first instance. 47 U.S.C. § 301(a)(1) specifically states that

-14-

Television Comm'n, 688 F.2d 1033, 1044 (5th Cir. 1982) (en banc) (Muir) ("The First Amendment does not prohibit the government itself from speaking, nor require the government to speak. Similarly, the First Amendment does not preclude the government from exercising editorial discretion over its own medium of expression."). As speaker, UMSL exercises control not only over the decision to accept or reject the donations, but also over the form and content of the announcements themselves.[9] Cf. Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 833 (1995) (Rosenberger) ("When the University determines the *content* of the education it

---

sponsor identification acknowledgments are necessary where valuable consideration has to be "accepted by" the broadcaster; presumably, if the licensee can "accept" the funds, it can voluntarily reject the funds as well. See The FCC and Broadcasting, 1800C1–FCC (December 1998) (implying that stations have discretion to reject underwriting funds for tobacco and alcoholic beverage producers, even though FCC has no specific rule directing station licensees to accept or reject such funds). Moreover, appellants can offer no support in the case law for the proposition that, where descriptive information about the donor is conveyed to the public, a donor has a First Amendment right to have its cash contribution accepted by the donee, in this case, UMSL.

[9] Appellants contend that, because KWMU does not investigate, promote, or vouch for the underwriter's products, services, or goals, the announcements therefore must express the views of the underwriters, not the government. See Brief of Appellants at 40. Although the logograms, slogans, and product summaries in these fifteen-second acknowledgments may in fact identify the underwriter, conveyance of this collateral information remains a communicative act of the government, even if it only involves a compilation of third-party speech. See Forbes, 118 S. Ct. 1633, 1639 ("Although [broadcaster] programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts."); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 570 (1995) (noting that a speaker need not "generate, as an original matter, each item featured in the communication"). Notably, this governmental announcement of broadcast sponsorship is a far cry from letters to the editor published in a government newspaper, where the letters (while edited for space limitations) are more obviously the speech of the writer, not the government. See Bryant, 862 F. Supp. at 580.

-15-

provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.") (emphasis added); Schneider, 875 F.2d at 1540 (noting that, where "the activity is not designed to function as a pure marketplace of ideas, 'the state may regulate content in order to prevent hampering the primary function of the activity.'") (quoting Muir, 688 F.2d at 1050)). KWMU staff members compose, edit, and review acknowledgment scripts to insure compliance with both FCC and internal guidelines. Moreover, the station does not broadcast "pre-produced" announcements submitted by underwriters; instead, KWMU employees themselves read the acknowledgments on air.[10] Finally, as speaker and licensee, UMSL is ultimately responsible for all of its broadcast material, including the underwriting announcements, and is subject to sanctions for failure to comply with its legal obligations. See 47 U.S.C. §§ 309(a) (licensee duty to broadcast for public necessity, interest, etc.), 503(b)(1), (b)(2)(A) (forfeiture provisions). As appellees point out, "[i]t would be anomalous to impose these penalties on a station for any speech other than its own." Brief for Appellees at 29.

Even assuming *arguendo* that insulation from forum analysis only arises for government speech adequately related to matters of editorial or journalistic discretion,[11]

_____

[10] Appellants also argue that the district court's reference to KWMU employees is improper, charging that the use of government employees for the transmission of the message is irrelevant to the analysis. Appellants misread the district court's analysis. The district court merely noted that, given the substantial editing, review, and lack of pre-produced messages, the announcements did not involve the expression of views with "minimal intrusion by the broadcaster," a criterion which helped form the basis for the Forbes Court's forum analysis of candidate debates.

[11] The Supreme Court has recently distinguished, in *dicta*, between speech on government property and speech by the government. In Rosenberger, 515 U.S. at 833, the Court noted that "when the State is the speaker, it may make content-based choices." Specifically, the Court has "permitted the government to regulate the content

we believe that KWMU's enhanced underwriting program meets that prerequisite. Decisions about what material to broadcast (including underwriting acknowledgments) involve editorial discretion because the broadcaster must decide whether to publish, what to publish, what to say, and what not to say. See CBS, 412 U.S. at 124 ("For better or worse, editing is what editors are for; and editing is selection and choice of material."); 1 New Shorter Oxford English Dictionary 784 (4th ed. 1993) (defining "edit" as "bring into order for publication after compilation by others or oneself"). Given that UMSL's license and corresponding obligations extend to "all matter broadcast," 47 U.S.C. §§ 301, 317, its editorial discretion is co-extensive and not limited to appellants' strict definition of "programming." See CBS, 412 U.S. at 123-25 (holding that broadcast licensees are not required to accept all paid political advertisements, because such forced access would "tend to transform broadcasters into common carriers and would intrude unnecessarily upon the editorial discretion of broadcasters.") (quoting FCC v. League of Women Voters, 468 U.S. 364, 379 (1984)); see also Turner, 512 U.S. at 636 (noting that the editorial discretion of cable operators extends not only to its choice of programs but also to "which stations . . . to include in its repertoire") (quoting Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 494 (1986)). In the instant case, UMSL did not wish to "publish" a financial association with the Missouri KKK. Because "accepting" underwriting funds from the

---

of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." Id. Morever, whereas forum analysis and viewpoint neutrality may be required when the government "expends funds to encourage a diversity of views from private speakers," the government's "own speech . . . is controlled by different principles." Id. at 834. Aside from these statements, no other Supreme Court decisions define the limitations, if any, which would be placed on such governmental speech. See 4 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 20.11, at 279 & n.2 (3d ed. 1999) (noting scholarly work on the governmental speech question). Because the speech in the instant case is also sufficiently editorial in character to fall within the scope of Forbes, we need not decide whether its status as governmental speech is alone enough to preclude forum analysis.

Missouri KKK would trigger statutorily-mandated publication, UMSL utilized its editorial discretion by rejecting the proposed sponsorship in the first place and thus choosing to remain silent.[12] To require UMSL to accept program sponsorship from all sources would surely intrude upon the editorial discretion which Congress delegated. See CBS, 412 U.S. at 124-25 ("That editors – newspapers or broadcast – can and do abuse this [editorial] power is beyond doubt, but that is no reason to deny the discretion Congress provided. Calculated risks of abuse are taken in order to preserve higher values . . . . To agree that debate or public issues should be 'robust, and wide-open' does not mean that we should exchange 'public trustee' broadcasting, with all its limitations, for a system of self-appointed editorial commentators.").

Appellants' analogy to public transit and airport ads is ill-chosen. As stated supra, the advertising in those cases communicated the speech of private individuals and groups, whereas the announcements here were the government's acknowledgments of program funding sources. Second, the underwriting spots do not fall within conventional understandings of promotional advertising, where companies freely trumpet their products and services. See 47 U.S.C. § 399b (forbidding public broadcasters from airing "advertisements," which "promote any service, facility, or product offered by any person who is engaged in such offering for profit" or which "express the views of any person with respect to any matter of public importance or interest."); see also 1992 Order, 7 F.C.C.R. 827 (clarifying scope of limits on underwriting announcements); 1984 Order, 97 F.C.C.2d at 263 (severely limiting content of underwriting announcements to certain types of identifying, but not promotional, information). Finally, the sponsorship identifications (and the donations

_____

[12] Appellants' argument to the contrary, see Brief for Appellants at 43, Chancellor Touhill's status as a non-journalist does not undercut her power to make editorial determinations, because such decisionmaking power is vested in the broadcaster licensee and delegated to the Chancellor. See CBS, 412 U.S. at 124; Muir, 688 F.2d at 1044 (upholding university vice-president's decision to cancel a program on university's public television station).

that precede them) are related to the journalistic purposes of the station, in that the acknowledgments convey important, federally-mandated information to the public about the source of funding for particular broadcast material. This "news" relates to the purposes and functions of a noncommercial educational FM broadcaster, whereas public transit and airport ads are only incidental to the primary goal of transportation. Cf. International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 682 (1992) (noting that goal of public airport terminal was "the facilitation of passenger air travel," not "the promotion of expression.").

In response to appellants' final argument, we note that forum analysis is not required by the mere fact of UMSL's creation of an enhanced underwriting program. UMSL instituted the enhanced underwriting program not to communicate underwriters' views, but rather to gather financial support for KWMU, to acknowledge such funding, and to provide brief identifications of its underwriters. The presence of government speech in the instant case makes inappropriate appellants' comparison of the enhanced underwriting program to the exception for candidate debates, given that those debates "allow[ed] *the candidates* to express *their views* with minimal intrusion by the broadcaster." Forbes, 118 S. Ct. at 1640 (emphasis added). As stated before, no such private speech is at issue here.

## Conclusion

We agree with the district court's conclusion that appellants' rights under the First and Fourteenth Amendments were not violated and appellees are entitled to judgment as a matter of law. Accordingly, we affirm the judgment of the district court.

-19-

A true copy.

Attest:

       CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.