**PMG INTERNATIONAL DIVISION, L.L.C., Plaintiff–Appellant,**

**v.**

**Donald H. RUMSFELD,\* in his official capacity as the Secretary of Defense; Department of Defense, Defendants–Appellees.**

No. 00–15652.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Sept. 13, 2002.

\* Donald H. Rumsfeld is substituted for his predecessor, William S. Cohen, as Secretary of the Department of Defense. Fed. R.App. P. 43(c)(2).

Gerald H. Goldstein (argued) and Cynthia Hujar Orr, Goldstein, Goldstein & Hilley, San Antonio, TX, for the Plaintiff–Appellant.

David O. Buchholz, United States Department of Justice, Civil Division, Washington, DC, for the Defendants–Appellees.

Before D.W. NELSON and HAWKINS, Circuit Judges, and FITZGERALD,** Senior District Judge.

## OPINION

MICHAEL DALY HAWKINS, Circuit Judge.

Three magazine distributors and three individuals with military affiliations (collec-

** Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

tively "PMG") filed suit against the Secretary of Defense and the Department of Defense (collectively "Defendants") to enjoin the enforcement of the Military Honor and Decency Act (the "Act"), which prohibits the sale or rental of sexually explicit material on Department of Defense property. PMG raised First and Fifth Amendment claims, arguing that the Act is unconstitutionally vague, restricts protected speech and, as enforced, has a disparate impact on minorities and women. We must decide whether the Act's ban on sexually explicit materials is government speech. Because we believe it is not, we must decide whether to agree with the Second Circuit, which, in considering claims virtually identical to those raised here, applied First Amendment forum analysis to conclude that military exchanges are nonpublic fora and that the Act is a viewpoint-neutral, reasonable regulation of speech.

## BACKGROUND

The Act became effective in December of 1996 and provides in relevant part:

(a) **PROHIBITION OF SALE OR RENTAL. The Secretary of Defense may not permit the sale or rental of sexually explicit material on property under the jurisdiction of the Department of Defense.**

(b) **PROHIBITION OF OFFICIALLY PROVIDED SEXUALLY EXPLICIT MATERIAL. A member of the armed forces or a civilian officer or employee of the Department of Defense acting in an official capacity may not provide for sale, remuneration, or rental sexually explicit material to another person.**

(c) **REGULATIONS. The Secretary of Defense shall prescribe regulations to implement this section.**

(d) **DEFINITIONS. In this section: (1) the term "sexually explicit material" means an audio recording, a film or video recording, or a periodical with visual depictions, produced in any medium, the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way. 10 U.S.C. § 2489a.**

The Department of Defense ("DOD") has implemented the Act through DOD Instruction 4105.70 and DOD Directive 1330.9. Instruction 4105.70 defines terms in the Act as follows:

3.1. **Dominant Theme. A theme of any material that is superior in power, influence, and importance to all other themes in the material combined.**

3.2. **Lascivious. Lewd and intended or designed to elicit a sexual response.**

3.3. **Material. An audio recording, a film or video recording, or a periodical with visual depictions, produced in any medium.**

3.4. **Property Under the Jurisdiction of the Department of Defense. Commissaries operated by the Defense Commissary Agency and facilities operated by the Army and Air Force Exchange Service, the Navy Exchange Service Command, the Marine Corps Exchanges, and U.S. Navy ships' stores . . .**

The Instruction also establishes the "Resale Activities Board of Review" (the "Board"). The Board must periodically review materials sold or rented on military property, and any such material it deems sexually explicit is withdrawn from military retail outlets. The Board initiated reviews in 1998 and has issued numerous

lists categorizing publications as sexually explicit or not sexually explicit.

The Act primarily affects military exchanges, which exist "for the comfort, pleasure, contentment, and mental and physical improvement of the armed forces," 5 U.S.C. § 2105(c), and to provide "a supplemental funding source for DOD [moral, welfare and recreation] programs." DOD Directive 1330.9 § 3.1. Exchanges provide a broad array of materials for sale or rent, including books, periodicals, and video and audio tapes. Exchanges are open only to members of the military and to those explicitly authorized under DOD Directive 1330.9 § E2.2.

In December 1996, counsel for appellants in the present action successfully obtained an injunction prohibiting the Act's implementation, *see General Media Communications, Inc. v. Perry*, 952 F.Supp. 1072 (S.D.N.Y.1997), but the Second Circuit reversed, applying traditional First Amendment forum analysis to conclude that exchanges were nonpublic fora, and that the Act was a reasonable, viewpoint-neutral regulation of speech. *See General Media Communications v. Cohen*, 131 F.3d 273, 277 (2d Cir.1997) *("General Media")*. PMG filed the immediate complaint alleging virtually the same First Amendment claims decided in *General Media*, namely that the Act: infringes on appellants' First Amendment right to sell, purchase, rent or otherwise distribute and receive sexually explicit material; discriminates on the basis of viewpoint; is unconstitutionally vague; and acts as a prior restraint on protected

speech. In the current action, PMG has added a Fifth Amendment disparate impact claim, arguing that almost all adult materials specifically "marketed and addressed" to minorities and women have been deemed sexually explicit. Also distinguishing the present action from *General Media* is the addition of individual plaintiffs wishing to purchase sexually explicit materials from military exchanges. The district court denied appellants' motion for a preliminary injunction and also dismissed appellants' equal protection claim.[1]

## ANALYSIS

### I. Forbes and Government Speech.

■ We review the factual findings underlying the court's denial of the preliminary injunction for clear error, and its conclusions of law de novo. *See South Coast Servs. Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265, 1269 (1982). The court dismissed PMG's First Amendment claims on the basis of *Arkansas Educational Television Commission v. Forbes ("Forbes")*, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998), which held that the government "speaks" in exercising editorial discretion, or through the "compilation of the speech of third parties." *Id* at 674, 118 S.Ct. 1633. The district court concluded that the Act merely regulated government speech, and that PMG had no right under the First Amendment to compel the government to offer sexually explicit materials at military exchanges. *See PMG Inter. Div. v. Cohen*, 57 F.Supp.2d 916, 919 (N.D.Cal.1999) ("While plaintiffs

---

1. Pursuant to stipulation by the parties, the court merged its order denying the preliminary injunction into its judgment on the merits (dismissal) of PMG's claims. *See Glacier Park Found. v. Watt*, 663 F.2d 882, 886 (9th Cir.1981) (permitting by stipulation consolidation of preliminary injunction with decision on merits). Our jurisdiction therefore arises under 28 U.S.C. § 1291.

clearly have a right to engage or listen to nonobscene speech, they have no constitutional right to compel the government to facilitate or participate in the making or communication of that speech.").

■ We first consider whether the district court correctly relied on *Forbes* to conclude that restrictions of speech on military exchanges are not subject to traditional First Amendment forum analysis. *Forbes* concerned an independent congressional candidate who claimed that his exclusion from a debate sponsored by a state-owned public television broadcaster violated the First Amendment. The Supreme Court reasoned that in the case of television broadcasting, "broad rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise" in fulfilling their statutory duty to serve the "public interest, convenience and necessity." *Id.* at 673, 118 S.Ct. 1633.

The court analogized the public broadcaster's programming decisions to a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school designing a curriculum. *Id.* The court declined to apply forum analysis so as to avoid "regiment[ing] broadcasters" absent congressional commands to do so, concluding that the editorial decisions of a public broadcaster constitute government speech.[2] *Id.* at 674, 118 S.Ct. 1633 (citations omitted).

### Forbes and Government Speech Acts.

The logic of *Forbes* has not been applied widely. Only one circuit case, also arising in the public broadcasting arena, has directly relied on *Forbes* in distinguishing government from private communications in the free speech context.[3] In *Knights of the Ku Klux Klan v. Curators of the University of Missouri ("Knights")*, 203 F.3d 1085, 1090 (8th Cir.2000), the Eighth Cir-

---

2. Nonetheless, *Forbes* carved out an exception for public broadcaster-sponsored candidate debates on the ground that the debates are "by design a forum for political speech by *the candidates*" not the government, and "of exceptional significance in the electoral process." *Id.* at 675, 118 S.Ct. 1633 (emphasis added).

3. Another case provides a *Cf.* citation to *Forbes. Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir.2000), concerned Los Angeles high school teacher who created a hallway bulletin board aimed at questioning another hallway bulletin board celebrating "Gay and Lesbian Awareness Month." *Id.* at 1005. The awareness campaign had been initiated by formal resolution through the Los Angeles Unified School District school board, who provided materials to schools to aid in "the elimination of hate and the creation of a safe school environment for all students." *Id.* When school principals didn't allow the teacher to maintain his board, he brought a 42 U.S.C. § 1983 action alleging violation of his First Amendment

rights. The *Downs* court noted *Forbes* in concluding that the teacher's postings were not entitled to First Amendment protection because the bulletin boards represented the speech of the school itself. *Id.* at 1012. We note that design of a school curriculum was one of the circumstances particularly recognized in *Forbes* as one involving the facilitation of some viewpoints and the exclusion of others. *Forbes*, 523 U.S. at 674, 118 S.Ct. 1633. We also note that *Downs* relies on certain facts (only school faculty and staff had access to post materials on the bulletin boards, bulletin board postings were subject to the oversight of the school's principals) to conclude that the postings were government speech acts. We do not feel the decision to stock some goods and not others at a military exchange is analogous to a school's attempt to articulate with unity of voice a district-wide diversity and acceptance "curriculum" component. Neither party contends that materials regulated by the Act could similarly be understood to contain messages attributable to the government.

cuit relied on *Forbes* to hold forum analysis inapplicable to a public radio station's editorial decision to refuse an underwriting offer by the Ku Klux Klan. In concluding that underwriting announcements were government speech, the court analogized the editorial decisions of a public radio station broadcaster to that of a public television broadcaster, observing that the acknowledgments were federally-mandated sponsorship identifications, and were composed, edited, reviewed and read by station staff. *Id.* at 1093–94.

We find the facts at issue here distinguishable, and cannot say that the properties covered by the Act should be exempt from public forum analysis. First, as the district court concludes, *Forbes* "identified certain policy considerations specifically associated with public broadcasting which are not present here." *PMG*, 57 F.Supp.2d at 918. Public broadcasting entities on radio and television are required to air programming that serves "public interest, convenience, and necessity," 47 U.S.C. § 309(a); *Knights*, 203 F.3d at 1091, and "Congress' decision to license broadcasters in such a manner indicated its preference that 'the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many.'" *Id.* (quoting *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 125, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)) ("CBS"). "Claims of access under[traditional] public forum precedents could obstruct the legitimate purposes of television broadcasters," and "[i]n the absence of any congressional command to '[r]egimen[t]' broadcasters' in this manner, . . . we are disinclined to do so through doctrines of our own design." *Forbes*, 523 U.S. at 675, 118 S.Ct. 1633. (citing *CBS*, 412 U.S. at 127, 93 S.Ct. 2080). The facts undergirding *Forbes* (and *Knights*) are

thus wedded closely to concerns that are not present here.

Furthermore, First Amendment claims arising with respect to military properties have traditionally been subject to forum analysis. *See, e.g., Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). We see no reason to apply the limited holding of *Forbes* beyond its factual parameters to alter our traditional approach to First Amendment questions that arise in the context of military property.

## II. Classifying Military Exchanges Under Traditional Public Forum Analysis.

■■■ Because we conclude that the Board's enforcement of the Act does not constitute government speech, traditional First Amendment forum analysis applies. *Int'l Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *see also Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("[T]he Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes."). Under the forum-based approach, government property is divided into three categories: public fora, designated public fora, and nonpublic fora. A public forum is a place that has "traditionally been available for public expression," such as public streets and parks. *Int'l Society for Krishna Consciousness, Inc.*, 505 U.S. at 678, 112 S.Ct. 2701. "A designated public forum is a nontraditional forum that the government

has opened up for expressive activity by part or all of the public." *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir.1998). All other public property is characterized as "nonpublic." *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439.

██ PMG contends that military exchanges are designated public fora. Designated public fora must be created through "purposeful governmental action." *Forbes*, 523 U.S. at 677, 118 S.Ct. 1633. The creation of a designated public forum requires a clear intention to "open[ ] a nontraditional forum for public discourse." *Id.*

██ In *General Media*, the Second Circuit performed forum analysis to conclude that military exchanges are nonpublic fora, and that the Act did not interfere with the First Amendment rights of various plaintiffs involved in the creation and production of adult materials. The court held that a designated public forum is not created by government inaction, nor by "permitting limited discourse." *General Media*, 131 F.3d at 279. "[W]hen the [government] reserves property for its specific official uses, it remains nonpublic in character." *Id.* (internal quotation marks omitted). Further, "[t]he Supreme Court has recognized that the government's dedication of property to a commercial enterprise is 'inconsistent with an intent to [create] a public forum.'" *Id.* (quoting *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439). Finally, "[m]ilitary property generally becomes public in character *only* when the government has intentionally abandoned any right to exclude civilian traffic and any claim of special interest in regulating expression." *Id.* (emphasis added and internal quotation marks omitted).

██ In determining whether the government has intentionally created a designated public forum, the factors to consider include "the policy and practice of the government, the nature of the property and its compatibility with expressive activity, and whether the forum was designed and dedicated to expressive activities." *Children of the Rosary*, 154 F.3d at 976. Applying these factors here, the government has historically limited the inventory of speech-related materials in military exchanges. "Much like a private sector retailer, the government identifies the products that it will stock for resale, selecting from a universe of merchandise that is far more extensive than the shelves of an exchange can hold." *General Media*, 131 F.3d at 280; *see also Forbes*, 523 U.S. at 679, 118 S.Ct. 1633. Further, military exchanges have traditionally limited access to military personnel, their families, and other specifically authorized personnel. "These limits on patrons' access serve as another indicator that the government did not intend to dedicate the exchanges to expression and discourse." *General Media*, 131 F.3d at 280. The military's continued exercise of control over the items stocked in military exchanges and the public's restricted access to the exchanges indicates that the military has not "abandoned any right to ... any claim of special interest in regulating expression." *Id.* The government has not, therefore, created a designated public forum, and military exchanges fall into the remainder category of nonpublic fora.[4]

### First Amendment Protections for Nonpublic Fora

██ We consider whether the restrictions imposed by the Act are viewpoint-

---

4. Appellees also correctly argue that military bases are not generally public fora, *see United* *States v. Albertini*, 472 U.S. 675, 686, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); *Greer v.*

neutral and reasonable. "The government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, so long as the restriction is not 'an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" *General Media,* 131 F.3d at 280 (quoting *Int'l Society for Krishna Consciousness, Inc.,* 505 U.S. at 679). But the "distinction between content and viewpoint discrimination is not a precise one." *General Media,* 131 F.3d at 281 (quoting *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510). The "distinction is one between 'subject matter' (content) and 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered' (viewpoint)." *General Media,* 131 F.3d at 281 (quoting *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510).[5]

[5] No arguments advanced in this case support the conclusion that the Act targets a specific viewpoint. At best, PMG contends that a ban on sexually explicit materials targets the viewpoint that "the human sexual response is positive, healthy and appropriate for consideration

and consumption by the adult public." First, we note that the Act does not interfere with the distribution of all sexually-oriented materials, only those that are deemed sexually explicit. Further, if we were to accept PMG's argument that materials depicting "nudity ... in a lascivious way," 10 U.S.C. § 2489a, articulate the "viewpoint" that the sexual response is positive, then we risk eviscerating altogether the line between content and viewpoint. To cite one example from the district court, "the inclusion in a magazine of an article about rock-climbing could be said to express a viewpoint that rock climbing is an activity worthy of attention," or positive, or healthy. *See PMG,* 57 F.Supp.2d at 920 n. 5. Respecting the dictates of *Rosenberger,* we agree with the district court and with *General Media* that the Act imposes restrictions based on the content, not viewpoint, of reviewed publications.

We also agree with the Second Circuit that the Act is reasonable in light of the Supreme Court's long-standing deference to military regulations in the First Amend-

---

*Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and that particular portions of military bases do not become public fora merely because they are "specifically used for the communication and information of ideas." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114–130 n. 6, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

5. The *General Media* court applied *Rosenberger* to the arguments made by PMG as follows:

The Act prohibits the sale or rental of recordings and periodicals "the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way." 10 U.S.C. §§ 2489a(d). Appellees suggest that this construction targets a *viewpoint* portraying "women as sexual beings or as the focus of

sexual desire," as well as a *viewpoint* of "lasciviousness." Even apart from the absence of any references to gender in the Act or its implementing directive, we find this line of argument unconvincing. To conceive of lasciviousness as a "specific premise" or "a standpoint from which a variety of subjects may be discussed and considered" strikes us as linguistic overreaching; how, for example, would one go about discussing and considering the political issues of the day from a lascivious viewpoint? The adjective "lascivious" is much more plausibly understood as helping to identify more particularly the subject matter (*i.e.,* content) that the Act encompasses: namely, depictions of nudity including sexual or excretory activities or organs, but only those depictions that are also lascivious.

*Id.* at 281, 282 (emphasis in original).

ment context, and because the Act seeks to restrict the sale of materials at odds with the military's "image of honor, professionalism, and proper decorum." *Id.* at 284 (citations omitted). Given the high level of deference due to congressional authority to regulate the military, *see Rostker v. Goldberg,* 453 U.S. 57, 64–65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), and the several arguments canvassed in *General Media,* 131 F.3d at 283–85, the restrictions imposed by the Act appear reasonable. We therefore hold that military exchanges are nonpublic fora, and that the restrictions imposed by the Act are both reasonable and viewpoint neutral.

## III. PMG's Equal Protection Claim.

 Fed.R.Civ.P. 12(b)(6) dismissal on PMG's Fifth Amendment claim is reviewed *de novo. See Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir.2001). The parties stipulated that, of all publications reviewed by the Board featuring African-American, Asian–American, Hispanic, or male models, only three titles were deemed not sexually explicit. PMG argues that this fact gives rise to a disparate impact claim, as "all titles marketed and directed to and for the benefit of Black, Asian and Hispanic and female individuals have been banned."

The district court correctly concluded that this contention is without merit. PMG fails to show that the Act, on its face or as applied, singles out a particular group of exchange patrons for differential treatment based on group membership, as is required to state an equal protection claim. *See United States v. Lopez-Flores,* 63 F.3d 1468, 1472 (9th Cir.1995). First, we observe that the Act does not on its face distinguish sexually explicit publications from non-sexually explicit publica-

tions on the basis of a protected class. Instead it provides a general definition of sexually explicit material that, in theory, applies equally to all reviewed publications, regardless of the gender or ethnicity of the models or actors featured. Further, PMG's argument only makes sense on the assumption that consumers of adult-themed materials exclusively purchase titles that feature models within their racial class, or of the opposite sex. Appellants cannot show that a Board review declaring sexually explicit all reviewed publications featuring Asian–American women, for example, would affect Asian–American men any differently than it would affect men of other races, or lesbians, who prefer materials featuring Asian–American women. Conversely, Asian–American men who prefer adult materials featuring Caucasian female models would not be touched by such a Board finding at all. Likewise, a finding that Playgirl is sexually explicit would not affect heterosexual women interested in that title differently than it would affect similarly interested gay men. Even if "ethnic" titles are "marketed and directed" to members of the racial class featured as models or actors, and other titles are marketed to heterosexuals, the stereotypes underlying an ad campaign do little to advance appellants' equal protection claim.

Additionally, PMG fails to show that relatively more benign adult materials featuring "minority" or male models would be deemed sexually explicit. To the contrary, the three titles ostensibly fitting that description, Playgirls Centerfolds, Players Calendar Series, and Oriental Massage, were not found to be sexually explicit.

 Even if the assumptions behind appellants' equal protection claim were true, the Department correctly argues that a disparate impact claim challenging a fa-

cially neutral-statute requires showing of discriminatory intent, *see United States v. Dumas,* 64 F.3d 1427, 1429–30 (9th Cir. 1995), or of a "stark pattern" of racially disparate enforcement. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Appellants invite the inference that because all eight Board members and their alternates are non-Hispanic whites, and because the Board has only two women, their classification decisions are based on discriminatory intent. Without more, appellants' inference should be ignored. As to a "stark pattern" of enforcement with a racially disparate impact, the district court concluded, and PMG does not dispute, that 86% of reviewed publications featuring Caucasian models were deemed sexually explicit. Even if the court incorrectly concluded that 74% of "minority" adult materials were banned,[6] a "stark pattern" of racially disparate enforcement would require a finding that all or nearly all "minority" publications had been deemed sexually explicit, *and* that all or nearly all "non-minority" publications were deemed not sexually explicit. *Cf. Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Given PMG's questionable assumptions and failures of proof, the district court correctly dismissed PMG's Fifth Amendment Claim.

**AFFIRMED.**

---

**6.** It appears from the record that the Board has deemed sexually explicit approximately thirty-two of thirty-five "minority" materials reviewed.